**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

FRANSMART, LLC, )
        Plaintiff, )
)
      v. )      **Case No. 1:10cv257**
)
FRESHII DEVELOPMENT, LLC, )
        Defendant. )

## MEMORANDUM OPINION

This is a diversity breach-of-contract dispute between two limited liability companies. Plaintiff, a franchise consulting company, contracted with defendant, a franchisor, to assist defendant in marketing and selling defendant's franchises. When defendant ceased making payments under the terms of the contract, plaintiff sued for breach. In response, defendant raises a number of affirmative defenses, including (1) lack of standing, (2) fraudulent inducement, (3) lack of specificity, (4) lack of mutuality, and (5) unconscionability.

At issue are the parties' cross-motions for summary judgment. Specifically, plaintiff moves for summary judgment on its breach-of-contract claim and for summary judgment on each of defendant's affirmative defenses. Defendant, in turn, moves for summary judgment on the following three affirmative defenses: (1) lack of standing, (2) lack of specificity, and (3) lack of mutuality.

For the reasons that follow, summary judgment must be granted in favor of plaintiff on the breach-of-contract claim and on all five of defendant's affirmative defenses.

I.[1]

Plaintiff, Fransmart, LLC ("Fransmart"), a Delaware limited liability company with its principal place of business in Alexandria, Virginia, is in the business of assisting franchisors in the sale of franchises. Fransmart was formed in October 2009 under the name DanCo Holdings, LLC ("DanCo"). Fransmart's predecessor-in-interest, now Fransmart Royalty Trust, LLC ("Royalty Trust"), was formed in 2003 as Fransmart, LLC ("Old Fransmart"). In late January or early February 2010, Old Fransmart transferred substantially all of its assets and liabilities to DanCo. Thereafter, DanCo changed its name to Fransmart and Old Fransmart changed its name to Royalty Trust. Dan Rowe has served as the President and Chief Executive Officer ("CEO") of both Old Fransmart and Fransmart.

Defendant, Freshii Development, LLC ("Freshii"), a Delaware limited liability company with its principal place of business in Chicago, Illinois, is the franchisor of fast-food restaurants that offer fresh, healthy foods instead of the unhealthy alternatives found at traditional fast-food establishments. Freshii's founder, Matthew Corrin, is a young entrepreneur who entered into the healthy-food restaurant business in 2005 when he opened his first restaurant, Lettuce Eatery, in Toronto. Corrin experienced considerable success with his first restaurant and quickly expanded to several additional Lettuce Eatery restaurants in the Toronto area.

In late 2007, Corrin began to consider franchising his fast-casual healthy restaurant concept in the United States under the name "Freshii." To this end, Corrin hired the law firm DLA Piper to create a Franchise Disclosure Document and a standard franchise agreement. Freshii then began offering franchises for sale in the United States in March 2008. At the time

---

[1] The undisputed facts recited herein are derived from the parties' pleadings and supporting documents.

Freshii started its franchising operations in the United States, Freshii's Chief Operating Officer,

Anthony DeSalvo, had substantial experience in the restaurant business.

In April 2008, Corrin and Rowe met in Chicago to discuss a potential business

relationship.  During the course of their conversations, Rowe represented that Old Fransmart

would provide a "sound expansion model for Freshii to create a successful nationwide franchise

brand in the United States and world-wide."  Freshii contends that Rowe's statement was

consistent with the statements on Old Fransmart's website, which claimed that "[Old]

Fransmart's consulting services are encompassed in the 'Fransmart Way' program, our

proprietary business methodology for developing emerging brands into franchise chains."

During the April 2008 meeting, Rowe also represented to Corrin that:

> [Old] Fransmart would be a strong long-term business partner
> because it was a company with a national presence in the United
> States, with offices on both coasts, full time public relations and
> marketing teams, and with numerous employees and staff
> experienced with start-up restaurant franchisors and who were not
> paid solely on a commission basis.

Following the April 2008 meeting, Rowe and Corrin spent the next few months negotiating the

terms of a business agreement.  The two representations made by Rowe during the April 2008

meeting—the representation about Old Fransmart's use of a proprietary "model" and the

representation about Old Fransmart's financial viability—were repeated in emails and telephone

conversations throughout the subsequent negotiation process.

The negotiations led, in the end, to the execution of a "Consulting Agreement"

(hereinafter "Agreement") on August 15, 2008.  The Agreement was drafted either by Rowe or

his attorney, and Corrin represented that his own attorney reviewed the Agreement.  The

Agreement, which lasts for a period of ten years, makes Old Fransmart "the sole and exclusive

consultant to [Freshii] in the marketing and sales of individual franchises" in the United States

- 3 -

and overseas (except Canada).  The Agreement states that it "is for franchise sales services only and does not include consulting or the rights to any [Old] Fransmart technology including but not limited to Autopilot, Franchise in a Box, etc."

The Agreement clearly delineates Old Fransmart's duties in a section titled "Duties of Consultant."  Under the sub-paragraph titled "General Duties," the Agreement states that Old Fransmart "shall be *solely and exclusively*[2] responsible for marketing and selling Qualified Franchise Units (as defined below), and will make such personnel available as [Old Fransmart] deems necessary for that purpose throughout the term of this Agreement."  After defining Qualified Franchise Units, the Agreement states that Old Fransmart "will use commercially reasonable efforts to identify and recruit potential franchisees on [Freshii's] behalf."  In the following sub-paragraph, which is labeled "Performance Requirements," the Agreement lists a specific number of franchises that Old Fransmart must sell each year.

The Agreement also contains compensation, termination, and non-compete provisions.  Specifically, the detailed compensation provisions require Freshii to pay Old Fransmart:  (1) fifty percent of certain fees, including the initial franchise fees; (2) twenty percent of the franchise royalty revenue; and (3) five percent of the supply revenue.  Under the terms of the Agreement, Freshii must pay royalties to Old Fransmart not only during the ten-year period covered by the agreement; it must continue to pay royalties after the Agreement expires or "forevermore."  The Agreement's termination provisions state that the Agreement terminates automatically at the end of the ten-year term, but Freshii may terminate the Agreement earlier if Old Fransmart fails to

---

[2] Emphasis added.

- 4 -

meet its sales quota or otherwise defaults on its material obligations.[3] If the basis for termination is Old Fransmart's failure to meet its sales quota, the Agreement allows Old Fransmart to cure its failure by meeting the sales quota for the current year and the following year by the end of the following year. The Agreement also includes a provision expressly permitting Old Fransmart to provide services to Freshii's competitors.

The Agreement states that Freshii has the right to approve all franchisees "in its sole discretion which shall not be unreasonable withheld." The Agreement also contains an assignment provision, which states that "[t]he provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and to their successors and assigns." Finally, the Agreement has a choice-of-law provision, which provides that the Agreement "shall be interpreted and construed exclusively under the laws of the Commonwealth of Virginia."

Once the Agreement was executed by the parties, Old Fransmart began selling franchises on Freshii's behalf and, as required by the terms of the Agreement, Freshii paid Old Fransmart for all franchise sales deals from August 2008 until approximately the end of January 2010. In late January or early February 2010, Old Fransmart restructured its business. According to Fransmart, the purpose of the restructuring was to enable Rowe to acquire majority ownership of the business and to allow the other owners of the company to maintain a passive interest in certain revenues without contributing additional capital. As part of the restructuring, Old Fransmart transferred substantially all of its assets and liabilities to another limited liability company, DanCo, in exchange for a continuing right to receive a portion of the business's revenues. As part of the transfer, Old Fransmart assigned to DanCo all of its contracts with

---

[3] Freshii does not allege that the Agreement's termination provision has been triggered either by the conduct of Old Fransmart prior to the assignment, or by Fransmart's conduct since the assignment.

franchisors for franchise sales, including the Agreement with Freshii. Following the asset transfer and assignment, DanCo changed its name to Fransmart and Old Fransmart changed its name to Royalty Trust. Royalty Trust continues to exist as a passive entity, collecting revenue and paying down its sole remaining bank loan liability.

Pertinent to this dispute are the similarities and differences between Old Fransmart and Fransmart. To begin with, Old Fransmart had twenty-four members at the time of the assignment, and its managers were Rowe, Chris Bright, Cal Simmons, and Jonathan Legg. Immediately after the assignment, Fransmart's sole member and manager was Rowe.[4]  Despite these differences in ownership and management structure, Fransmart carried on Old Fransmart's business operations in the same manner, particularly with respect to the Freshii account. Prior to the assignment, Rowe was the CEO and President of Old Fransmart, with control over the business's day-to-day operations. After the assignment, Rowe had the same roles and authority within Fransmart. Moreover, before the assignment, Rowe and Paul Tran were the primary sales persons working on the Freshii account, and both Rowe and Tran continued to perform those roles after the assignment.

Freshii points out that some of Old Fransmart's employees did not make the transition to Fransmart. Specifically, Freshii notes that Chris Bright, one of Old Fransmart's founders and its Chief Financial Officer, is not affiliated with Fransmart. Yet, it appears that Corrin met Bright on only two occasions. During one meeting, Bright and Corrin discussed a variety of subjects relating to Freshii, including direct mail marketing, unit economics and reporting tools, and strategy for deploying marketing funds. During a second meeting, Bright provided Corrin with introductions to direct mail marketing representatives, audit companies, and secret shoppers. In

---

[4] In May 2010, Fransmart raised approximately $500,000 in new capital and Rowe maintains his majority ownership of Fransmart.

addition, Freshii notes that Tommy Reiser, Old Fransmart's Vice President for Finance, is no longer an employee of Fransmart. In this respect, the record reflects that Reiser's contact with Freshii was quite limited. In September 2008, Reiser provided advice to Freshii's outside accountants relating to the accounting treatment for franchise fees. Finally, Freshii alleges that one of Fransmart's new employees does not have previous franchising experience, and that two of Fransmart's employees are selling franchises for one of Freshii's competitors.

After the assignment, Fransmart sold franchises on Freshii's behalf, with Rowe and Tran continuing to serve as the primary sales persons on Freshii's account. Since January 2010, Fransmart has helped Freshii close at least eight franchise deals consisting of sixty-eight Qualified Franchise Units. Since learning of the assignment, however, Freshii has refused to pay Fransmart for its marketing and sales services.[5]

Fransmart initiated this action on March 16, 2010, alleging in a one-count complaint that Freshii is liable for breach of contract for failure to pay Fransmart the fees due under the Agreement since January 2010. Fransmart filed an amended complaint on July 14, 2010, alleging that Freshii is also liable for damages based on a theory of *quantum meruit*. Thereafter, Freshii filed an answer, asserting five affirmative defenses to the breach-of-contract claim: (1) Fransmart lacks standing to sue for breach of contract because the Agreement is a non-assignable personal services contract and hence the assignment from Old Fransmart to Fransmart is invalid; (2) Fransmart's claims are barred because Freshii was fraudulently induced to enter into the Agreement; (3) the Agreement is invalid for lack of mutuality; (4) the Agreement lacks the requisite specificity for the creation of a valid and binding contract; and (5) the Agreement violates public policy because it is unconscionable.

---

[5] Freshii takes the position that Fransmart's marketing and sales services since the assignment are entirely voluntary.

Fransmart moved for summary judgment on the issue of whether Freshii is liable for breach of contract and on all five of Freshii's affirmative defenses. Freshii filed a cross-motion for summary judgment on the following three affirmative defenses: (1) lack of standing; (2) lack of specificity; and (3) lack of mutuality.[6]  Following oral argument on the motions, the parties were directed to file supplemental briefs. *See Fransmart, LLC v. Freshii Dev., LLC*, No. 1:10cv257 (E.D. Va. Nov. 12, 2010) (Order).  Both parties have submitted their supplemental briefs and the issues are now ripe for disposition.

## II.

The summary judgment standard is too well-settled to require elaboration here.  In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Importantly, to defeat summary judgment, the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id*. at 324; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless the party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322.

## III.

As is typical in diversity actions, the choice-of-law question is a threshold issue.  Here, this question is easily resolved as the Agreement contains a valid and enforceable clause selecting Virginia law.  Because this is a diversity action, the governing substantive law, including choice of law rules, is that of the forum state—in this case, Virginia. *See Klaxon Co.*

---

[6] Neither side has moved for summary judgment with respect to Fransmart's *quantum meruit* claim, and it is unnecessary to address this claim given the result reached here.

*v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). And it is well-recognized that "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Tate v. Hain*, 25 S.E.2d 321, 325 (Va. 1943) (holding that the intent of the parties to choose governing law "will always be given effect except under exceptional circumstances evincing a purpose in making the contract to commit a fraud on the law") (quoting 11 Am Jur. Conflict of Laws § 119). No such circumstances exist here; thus, the law of Virginia governs matters arising from the Agreement.

## IV.

Analysis of the motions at bar logically begins with Fransmart's motion for summary judgment on its breach-of-contract claim, as doing so serves to focus attention on the parties' central dispute, namely whether the agreement is enforceable against Freshii given Freshii's asserted affirmative defenses. In Virginia, the elements of a breach of contract action are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *See Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). The parties do not dispute that the second and third elements are established on this record. While Fransmart has continued to market and sell franchises since January 2010, Freshii has failed to pay Fransmart under the terms of the Agreement. Thus, the central issue to resolve with respect to Fransmart's motion for summary judgment on its breach-of-contract claim is whether there is a valid, binding agreement between Fransmart and Freshii. On this issue, Freshii has asserted five affirmative defenses: (1) lack of standing; (2) fraudulent inducement; (3) lack of specificity; (4) lack of mutuality; and (5) unconscionability. Each of these five defenses is addressed in turn.

- 9 -

V.

## A. Standing

Freshii's first affirmative defense is that Fransmart does not have standing to sue for

breach of contract. Specifically, Freshii argues that the Agreement is a non-assignable personal

services contract and hence Old Fransmart's assignment of the Agreement to Fransmart is

invalid. Thus, Freshii contends that only Old Fransmart is a party to the Agreement and only

Old Fransmart, not Fransmart, can sue for breach of the Agreement. The question presented,

then, is whether the assignment of the Agreement from Old Fransmart to Fransmart is valid.

In Virginia, the general rule is that contracts are freely assignable unless the assignment

is prohibited by the terms of the agreement, is barred by public policy, or involves personal

services. *See, e.g., J. Maury Dove Co. v. New River Coal Co.*, 143 S.E. 317, 327 (Va. 1928); *see*

*also In re Jones Constr. & Renovation Inc.*, 337 B.R. 579, 586 (E.D. Va. 2006) (applying

Virginia law).[7] Here, the Agreement does not have a provision that expressly prohibits

assignment, nor is assignment prohibited by public policy. Freshii's principal argument is that

the Agreement is a personal services contract, which is generally defined as a contract that is

based on a relationship of trust and confidence or that requires a party to exercise skill, judgment,

or expertise. *See McGuire v. Brown*, 76 S.E. 295, 297 (Va. 1912); *Epperson v. Epperson*, 62

S.E. 344, 346 (1908). Thus, Freshii contends that the Agreement was not assignable without its

consent. *See Reynolds & Reynolds Co. v. Hardee*, 932 F. Supp. 149 (E.D. Va. 1996) ("Under

---

[7] The assignment at issue here involves both an assignment of rights and a delegation of duties from Old Fransmart to Fransmart. Often, analysis of assignment issues requires distinguishing between contract rights and duties. *See* Restatement (Second) of Contracts §§ 317-18 (1979) (promulgating rules governing assignment of rights and delegation of duties). Here, the distinction between rights and duties is less relevant because the parties do not rely on it and, more importantly, analyzing the assignment of rights and delegation of duties separately would have no effect on the outcome.

- 10 -

Virginia law, contracts for personal services are not assignable, unless both parties agree to the assignment.").

Virginia law on personal services contracts is relatively sparse and the authority that exists does not draw a particularly sharp line between personal services contracts and non-personal services contracts.[8]  Moreover, Virginia has never addressed whether an exclusive marketing and sales agreement, like the one at issue here, is a personal services contract.  For its part, Freshii argues that the Agreement is a personal services contract because Freshii placed trust and confidence in Old Fransmart's skill, knowledge, and expertise when Freshii made Old Fransmart its exclusive marketing and sales agent.  Freshii's argument is not without some force. The Agreement makes Old Fransmart exclusively responsible for marketing and selling Freshii's franchises; the territory covered by the Agreement is worldwide (except Canada); and the Agreement gives Old Fransmart significant discretion in deciding how to market and sell franchises.  Freshii correctly points out that courts in other jurisdictions have concluded that exclusive sales contracts and exclusive distributorship agreements are non-assignable personal services contracts because they are based on a relationship of trust and confidence.[9]

---

[8] *See Florance v. Kresge*, 93 F.2d 784, 787 (4th Cir. 1938) (contract to serve as rental agent responsible for collecting rents was a personal services contract) (applying Virginia law); *Reynolds*, 932 F. Supp. at 153 (employment agreement to serve as salesman for stationary company was a personal services contract); *McGuire*, 76 S.E. at 297 (contract with family member to serve as sales agent for sale of land was a personal services contract); *Epperson*, 62 S.E. at 346 (contract giving land to sons in exchange for taking care of parents was a personal services contract).

[9] *See, e.g.*, *Wetherell Bros. Co. v. United States Steel Co.*, 200 F.2d 761, 763 (1st Cir. 1953) (exclusive sales agency); *Berliner Foods Corp. v. Pillsbury Co.*, 633 F. Supp. 557, 559 (D. Md. 1986) (exclusive distributorship); *Egner v. States Realty Co.*, 26 N.W.2d 464, 469-70 (Minn. 1947) (exclusive sales agency); *Paige v. Faure*, 127 N.E. 898 (N.Y. 1920) (exclusive sales agency).

Yet, those cases are ultimately unpersuasive because there are terms in the Agreement that weigh strongly against construing the Agreement as a personal services contract. Specifically, the Agreement is between two corporate entities, the Agreement lasts for ten years, and the Agreement does not identify any individual as being material to performance. Indeed, the Agreement has a clause that expressly provides that its obligations can be performed by anyone in the company. Specifically, the Agreement states:

> [Old Fransmart] shall be solely and exclusively responsible for marketing and selling Qualified Franchise Units (as defined below), *and will make such personnel available as [Old Fransmart] deems necessary for that purpose throughout the term of this Agreement*."

Agreement ¶ 3 (emphasis added). The rationale for not allowing the free assignability of personal services contracts is that performance by a particular person is a material term of the contract; yet, that rationale does not apply in cases where the contract is between two corporate entities and the contract specifically provides that anyone can perform the contractual duties. *See Bd. of Trs. of Mich. State Univ. v. Research Corp.*, 898 F. Supp. 519, 522 (W.D. Mich. 1995) (rejecting the argument that a contract between a university and a corporation was a personal services contract because the contract was between corporate entities, did not specify any particular individuals, and was of indefinite duration reflecting that no particular person was specified as essential to the contract); *see also In re Matter of Sentry Data, Inc.*, 87 B.R. 943, 949-50 (N.D. Ill. 1988) (holding that exclusive marketing and sales agreement between two corporations was not a personal services contract).[10] These principles point persuasively to the conclusion that the Agreement is not a personal services contract.

---

[10] It is worth noting that the cases holding that a contract with a corporation can be a personal services contract because the corporation's charter serves as its "personal character," s*ee New York Bank Note Co. v. Hamilton Bank Note Engraving & Printing Co.*, 73 N.E. 48, 52 (1905),

In any event, it is unnecessary to reach or decide whether the Agreement is a personal

services contract because the terms of the contract make clear that the parties intended to allow

this assignment.[11]  To begin with, the Agreement contains a clause that addresses assignments.

Specifically, paragraph 15(a) of the Agreement—a "successors and assigns" clause—provides as

follows:

> **Binding Agreement and Assignability**.  The provisions of this
> Agreement shall be binding upon and inure to the benefit of the
> parties hereto and to their successors and assigns.

Virginia courts have not addressed the effect of a "successors and assigns" clause in a factual

setting similar to the one presented here.  Importantly, however, many other jurisdictions have

concluded that similar provisions demonstrate that the parties contemplated and assented to

future assignment.[12]  As one court succinctly put it, "parties may agree to make an otherwise

unassignable contract assignable by insertion of a 'successors and assigns' provision."  *KN Gas*

---

are not persuasive here.  The record evidence does not establish that Freshii contracted with Old
Fransmart because of specific terms in its operating guidelines, or that Fransmart's operating
guidelines are materially different from Old Fransmart's.

[11] *See* 29 Williston on Contracts § 74:40, at 485-86 (4th ed. 2003) ("Rights that would not
otherwise be capable of assignment because they are too personal in character, and duties, the
performance of which for a similar reason could not be delegated, may be assigned or delegated
if the contract so provides, or if, even absent such a provision, the other party consents.");
Restatement (Second) of Contracts § 323(1) (1979) ("A term of a contract manifesting an
obligor's assent to the future assignment of a right or an obligee's assent to the future delegation
of the performance of a duty or condition is effective despite any subsequent objection.").

[12] *See, e.g.*, *Katahdin Ins. Group v. Elwell*, No. CV-00-198, 2001 WL 1736572, at *4 (Me.
Super. Ct. July 9, 2001); *Saliterman v. Finney*, 361 N.W.2d 175, 178 (Minn. 1985); *Gillespie v.
DeWitt*, 280 S.E.2d 736, 743 (N.C. Ct. App. 1981); *Mail-Well Envelope Co. v. Saley*, 497 P.2d
364, 368 (Or. 1972); *Orkin Exterminating Co v. Burnett*, 146 N.W.2d 320, 327 (Iowa 1967); *In
re Frayser's Estate*, 82 N.E.2d 633, 638 (Ill. 1948); *Baum v. Rock*, 108 P.2d 230, 234 (Colo.
1940); *Alden v. Frank Imp. Co.*, 77 N.W. 369 (Neb. 1898); *see also Mehul's Inv. Corp. v. ABC
Advisors, Inc.*, 130 F. Supp. 2d 700, 706 (D. Md. 2001) (holding that contract was not a personal
services contract, in part, because it contained a "successors and assigns" clause); *UAW-GM
Human Res. Ctr. v. KSL Recreation Corp.*, 79 N.W.2d 411, 422 (Mich. Ct. App. 1998) (same).

*Supply Servs., Inc. v. Am. Prod. P'ship*, 994 F. Supp. 1283, 1286 (D. Colo. 1998) (citing *Baum v.
Rock*, 108 P.2d 230, 234 (Colo. 1940)).

Freshii attempts to minimize the importance of the "successors and assigns" clause by
arguing that the insertion of such a clause does not mean that the parties intended to permit
assignment. The only authority cited by Freshii to support its argument is *Paige v. Faure*, 127
N.E. 898 (N.Y. 1920), which is distinguishable on its facts. In that case, a tire manufacturer,
Faure, contracted with two individuals, Paige and Linder, to serve as Faure's exclusive sales
agents. Thereafter, Linder sold his interest in the contract to Paige, and Paige continued to
perform under the terms of the original contract. The issue confronted by the court of appeals
was whether Linder could assign his interest in the contract to Paige. The court of appeals noted
that the contract had a "successors and assigns" clause, but it held that the clause was not
conclusive of the assignment issue. Specifically, the court of appeals stated that "[t]he intention
of the parties to a contract must be ascertained, not from one provision, but from the entire
instrument." *Id*. After considering the contract as a whole, the court of appeals determined that
the contract was not assignable for two reasons. First, Faure had contracted with two individuals
and he was entitled to the sales efforts of both Paige and Linder. Second, the contract obligated
Faure to extend credit to Paige and Linder, and Faure might not have agreed to this term had he
known that Linder would assign his contract rights to Paige. In this case, Freshii did not contract
with specific individuals; rather, it contracted with a corporate entity. Moreover, unlike the facts
in *Paige*, Freshii did not extend credit to Old Fransmart. Therefore, the assignment of the
contract from Old Fransmart to Fransmart did not alter the character of Freshii's contractual
obligation, which is simply to compensate Old Fransmart, now Fransmart, for the sale of
franchises.

- 14 -

Even if the "successors and assigns" clause, alone, is not determinative of the parties' intent to permit assignment, the other terms in the Agreement make clear that the parties intended to permit this assignment.  As noted above, the Agreement is between two corporate entities, lasts for ten years, and contains a clause that provides that Old Fransmart's obligations can be performed by anyone in the company.  Based on these terms, it is clear that at the time the Agreement was executed, Freshii understood that the composition of Old Fransmart's management and employees would not remain static, and even if the management and employees did remain unchanged, that the employees assigned to Freshii's account might well change over time.  Moreover, the assignment here caused relatively few changes to Old Fransmart's business.  Indeed, immediately following the assignment, the primary differences between Old Fransmart and Fransmart were that Fransmart had one manager whereas Old Fransmart had four managers, and Fransmart's staff did not include some of the employees who previously worked for Old Fransmart.  If these changes had occurred within Old Fransmart, they would certainly not have constituted breaches of the Agreement.  Thus, it is reasonable to conclude that Freshii intended to allow similar changes to occur as part of a restructuring plan that involved the assignment of the Agreement to a successor company.[13]

Assuming, *arguendo*, that the Agreement is a non-assignable personal services contract, the assignment at issue here is nonetheless valid for it is well-settled that a partnership or corporate entity can assign contracts to a successor entity if the successor entity is substantially

---

[13] In its supplemental brief, Freshii argues that the Agreement cannot be assigned because Virginia does not permit the assignment of executory contracts with mutual performance obligations.  Specifically, in *Maury Dove*, the Supreme Court of Virginia held that "[w]hen the contract contains mutual obligations and liabilities . . . it cannot be assigned by one party without the consent of the other."  143 S.E. at 327.  This rule does not prohibit the assignment at issue here because the terms of the Agreement manifest the parties' consent to assignment.

the same as the original entity.  This sound principle finds expression in *Knudsen v. Torrington Co.*, 254 F.2d 283, 287 (2d Cir. 1958), where the Second Circuit stated:

> We believe there is an implied authority arising from the contract to delegate duties when the delegation results from changes in the form of the business organization and the changes do not tend to defeat the considerations which the principal had in mind in selecting this agent.[14]

Here, no reasonable juror could conclude based on the undisputed factual record that Fransmart is materially different than Old Fransmart.  Old Fransmart transferred substantially all of its assets and liabilities to Fransmart.  Moreover, the record evidence shows that Rowe was the dominant manager of Old Fransmart with respect to the Freshii account,[15] and Rowe remains the dominant manager of Fransmart.[16]

Freshii attempts to create a factual dispute on the materiality issue by arguing that key employees of Old Fransmart are not employed by Fransmart.  Specifically, Freshii argued in its briefs, and at oral argument, that Chris Bright's knowledge and experience was an important reason that Freshii contracted with Fransmart.  Yet, the record evidence shows that Bright's only interaction with Freshii for the first eighteen months of the Agreement consisted of participating in two meetings with Corrin in 2009.  Similarly, Freshii points out that Tommy Reiser, Old

---

[14] *See also Gulf States Creosoting Co. v. Loving*, 120 F.2d 195, 199 (4th Cir. 1941) (holding that an assignment that was merely part of the transfer of assets to a corporation that was formed to take over a going business, where the same persons were in control of the business after the transfer, did not fall within the rule barring assignment of personal services contracts).

[15] The record evidence shows that Rowe negotiated the Agreement, served as Old Fransmart's CEO with control over its day-to-day operations, and was as one of two primary sales persons on the Freshii account.

[16] *See Rossetti v. City of New Britain*, 303 A.2d 714, 719 (Conn. 1972) (permitting partnership to assign contract for architectural services to another partnership where dominant partner was member of both partnerships); *Des Moines Blue Ribbon Distribs. v. Drewrys Ltd.*, 129 N.W.2d 731, 738-39 (Iowa 1964) (holding that assignment from partnership to corporation was valid, in part, because dominant partner was member of new corporation).

Fransmart's Vice President of Finance, is not an employee of Fransmart. Yet, the record
evidence shows that Reiser had minimal contact with Freshii, assisting Freshii with an
accounting issue on one occasion in September 2008. Simply put, there is no evidence on the
undisputed factual record that any Old Fransmart employee was material to the Agreement, other
than Rowe, and Rowe is still the dominant manager of Fransmart. Thus, no reasonable juror
could conclude on this undisputed factual record that the assignment from Old Fransmart to
Fransmart has deprived Freshii of the benefit of its original bargain.[17]

In sum, the line between personal services contracts and non-personal services contracts
is indistinct in Virginia law, but the pertinent factors point away from construing the Agreement
as a personal services contract. In any event, it is not necessary to reach or decide whether the
Agreement is a personal services contract because the terms of the Agreement make clear that
the parties intended to permit this assignment. Specifically, the Agreement is a contract between
two corporate entities, lasts ten years, does not identify any person as being material to
performance, and contains a "successors and assigns" clause. Finally, even if the Agreement is a
non-assignable personal services contract, the law makes clear that the Agreement may be
assigned to a successor entity if there is no material difference between the assignor and
assignee, and here the record evidence shows that there is no material difference between Old

---

[17] In its briefs, Freshii also argues that Fransmart is materially different from Old Fransmart
because Fransmart has a new employee working on Freshii's account that has little franchising
experience, and two of Fransmart's employees are selling franchises for one of Freshii's
competitors. These are not material changes. As stated above, the Agreement provides that any
person can market and sell Freshii's franchises, so the fact that Fransmart added new employees
is not a material change. Moreover, the Agreement has a provision that expressly provides that
Fransmart can sell franchises for competitors of Freshii, and the fact that two of Fransmart's
employees are doing so is irrelevant to the issues raised here.

- 17 -

Fransmart and Fransmart. Accordingly, Fransmart is entitled to summary judgment on Freshii's claim that Fransmart lacks standing to sue for breach of contract.

## B. Fraudulent Inducement

In addition to challenging the assignability of the Agreement, Freshii also challenges the validity of the Agreement itself. Freshii's first argument is that the Agreement is invalid because Freshii was fraudulently induced to enter into the Agreement. In Virginia,[18] to prevail on a claim for fraud in the inducement, a plaintiff must prove the following three elements by clear and convincing evidence: (1) the defendant made a material misrepresentation for the purpose of procuring a contract; (2) the plaintiff relied on the misrepresentation; and (3) the plaintiff was induced by the misrepresentation to enter into the agreement. *See Brame v. Guarantee Fin. Co.*, 124 S.E. 477, 481 (Va. 1924).[19]

Freshii contends that it was fraudulently induced into entering the Agreement in two separate ways. First, Freshii claims that during the negotiation process Rowe represented that Old Fransmart would market and sell franchises for Freshii using a model for franchise growth

---

[18] In their briefs, both parties cited Virginia law when addressing Freshii's fraudulent inducement claim. Ordinarily, when a cause of action arises in tort, Virginia applies the law of the state where the tortious conduct or injury occurred. *See Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993). However, when a choice of law clause is broad enough to encompass contract-related tort claims such as fraudulent inducement, the tort claims are also governed by the choice of law clause. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999). Here, the choice of law language is broad enough to cover tort and contract claims arising from the Agreement. Moreover, even assuming the language is not broad enough to cover tort claims, it appears from the record that a majority of the tortious conduct occurred in Virginia, and therefore Virginia law would apply.

[19] Some courts have held that the elements of fraud in the inducement are the same as the elements for actual fraud, which are: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with the intent to mislead; (5) reliance by the party misled; and (6) resulting damage to the party misled. *See Hitachi*, 166 F.3d at 628; *Grubb & Ellis Co. v. Potomac Med. Bldg., LLC*, No. 1:08cv971, 2009 WL 3175999, at *13 (E.D. Va. Sept. 30, 2009); *Elliot v. Great Point Partners, LLC*, Nos. 1:10cv1019; 1:10cv1047, 2011 WL 63657, at *4 (E.D. Va. Jan. 5, 2011).

and expansion. Despite these representations, Freshii alleges that Old Fransmart never intended to use a model to grow Freshii's business in an organized fashion, but rather Old Fransmart intended to sell franchises wherever possible to maximize Old Fransmart's short-term revenue.

Freshii's first theory of fraud in the inducement fails because Freshii has not identified a false statement of *present* fact. In Virginia, it is well-settled that "fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *McMillion v. Dryvit Sys., Inc.*, 552 S.E.2d 364, 368 (Va. 2001) (internal quotations omitted). If the rule were otherwise, every breach-of-contract claim would also give rise to a fraud claim. *See Sea-Land Serv., Inc. v. O'Neal*, 297 S.E.2d 647, 651 (Va. 1982). Here, Rowe's representations that Old Fransmart would sell franchises using a model for growth and expansion are clearly not representations of existing fact, but rather promises relating to future performance. As such, these representations cannot serve as the basis for a fraudulent inducement claim.

Freshii attempts to save this claim by arguing that "Virginia courts have long recognized that a statement of future performance made with knowledge that such performance was not going to be made may be the basis for a fraudulent inducement claim." Def.'s Opp'n Br. (Doc. No. 50) a 26. Freshii is correct that Virginia courts recognize that a promisor may commit fraud if the promisor has no intent to perform at the time the promise is made. *See Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 368 (Va. 2008) ("[I]f a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud."). Yet, no reasonable juror could find by clear and convincing evidence on the basis of the undisputed facts in this record that Old Fransmart did not intend to sell franchises using a model for franchise growth and expansion at

the time Rowe represented to Corrin that such a model would underlie Old Fransmart's marketing and sales efforts. Indeed, the record is entirely devoid of facts explaining the substance of the model, making it impossible to determine whether Old Fransmart deviated from the model during the eighteen months that it sold franchises on Freshii's behalf.[20] If the record evidence does not establish that Old Fransmart deviated from the model, it logically follows that the record evidence cannot show that Old Fransmart never intended to adhere to the model.

Freshii's first theory of fraudulent inducement also fails because Freshii did not reasonably rely on Fransmart's statements regarding a model. *See Hitachi*, 166 F.3d at 629 ("In order to prove reliance, a plaintiff must demonstrate that that its reliance was reasonable and justified.") (internal quotations and citations omitted). Here, it is difficult to see how Freshii reasonably could have relied upon Old Fransmart's representations regarding use of a model for franchise growth and expansion, or how Freshii was induced by these representations to enter the Agreement, when the substance of the model, on this record, was never described or discussed between the parties. In any event, it appears that Old Fransmart's representations about having a

---

[20] The only evidence in the record supporting Freshii's position that Old Fransmart deviated from its model for franchise growth and expansion is a single paragraph in a declaration from Freshii's expert. Specifically, Freshii's expert states: "The sales of franchise [sic] by Old Fransmart does not reflect a rational plan of franchise growth and expansion, but rather a scatter-shot approach using master franchises, that in my opinion reflects a singular focus by Old Fransmart to maximize its short-terms [sic] revenues under the Consulting Agreement." Kushell Decl. ¶ 10. Even assuming this statement could pass muster under Rule 702, Fed. R. Evid., and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), it falls far short of providing clear and convincing evidence that Old Fransmart did not have some sort of model or methodology for growth and expansion, nor does it provide clear and convincing evidence that Old Fransmart failed to use a model for franchise growth and expansion. At most, it shows that Freshii's expert disagrees with Old Fransmart's approach to selling franchises. On this point, it is worth noting that regardless of the methodology used by Old Fransmart, it achieved reasonable success, as Old Fransmart, now Fransmart, has sold more than the minimum number of franchises required under the terms of the Agreement.

model or methodology for marketing and selling franchises were true; there is no dispute that Old Fransmart, now Fransmart, has exceeded the minimum sales quota in the Agreement.

Fransmart argues that Freshii did not reasonably rely on Rowe's representations for another reason. According to Fransmart, the crux of Freshii's fraudulent inducement claim is that Freshii believed—based on Rowe's representations—that Freshii would receive more than franchise sales services from Old Fransmart. In this regard, Fransmart points out that Freshii could not reasonably rely on these representations because the Agreement expressly states that it is for franchise sales services only. Freshii counters by arguing that Fransmart is mischaracterizing its fraudulent inducement claim. Specifically, Freshii concedes that it is not claiming that Old Fransmart falsely represented that it would provide services beyond franchise sales services,[21] but rather that Old Fransmart falsely represented that it would market and sell franchises based on a model for franchise growth and expansion. Yet, Freshii's claim that Old Fransmart fraudulently misrepresented the scope of services to be provided is addressed here because, despite saying that it does not make this claim, Freshii has continued to assert it. Conclusive here is the well-settled rule that a party to a contract cannot reasonably rely on oral statements that are contradicted by the plain terms of the final agreement.[22] In this case, the

---

[21] *See* Def.'s Opp'n Brief (Doc. No. 50) at 23 ("Freshii's fraudulent inducement claim . . . is not based on the 'scope of services' to be provided . . . and Plaintiff's assertions that it does [sic] is a case of misdirection."); *Id.* at 24 ("Plaintiff then puts forward the straw man that Freshii's fraudulent inducement defense is based on misstatements about the scope of services that were to be provided . . . .").

[22] *See Scheduled Airlines Traffic Offices, Inc. v. Objective Inc.*, 180 F.3d 583, 590 (4th Cir. 1999) (holding that travel management service provider's alleged representation to computer software developer that provider and developer would market proposed software jointly and divide revenue did not constitute fraud in the inducement, as representation was contradicted by express language of parties' written agreement, which superseded any previous discussions) (applying Virginia law); *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 631-32 (4th Cir. 1977) (holding that franchisees could not reasonably rely on oil company's representations that contracts would be renewed annually so long as franchisees complied with contractual obligations because contracts

Agreement expressly provides that "[t]his Agreement is for franchise sales services only and does not include consulting or the rights to any Fransmart technology including but not limited to Autopilot, Franchise in a Box, etc." Agreement ¶ 1. Thus, to the extent that Freshii claims that Old Fransmart promised to provide services other than franchise sales services, its fraud in the inducement claim fails because Freshii could not reasonably rely on oral statements that are contradicted by the plain terms of the Agreement.[23]

Freshii's second theory of fraud in the inducement is that Fransmart misrepresented its financial condition. Specifically, Freshii alleges that during the negotiation process, Corrin asked Rowe questions expressing concern about whether or not Old Fransmart was financially sound and sufficiently viable to serve as Freshii's exclusive marketing and sales agent for a possible ten-year period. In response, Rowe allegedly told Corrin that:

> Fransmart would be a strong long-term business partner because it was a company with a national presence in the United States, with offices on both coasts, full time public relations and marketing teams, and with numerous employees and staff experienced with start-up restaurant franchisors and who were not paid solely on a commission basis.

Freshii concedes that these representations were literally true, but claims they were misleading because Fransmart was on the brink of financial trouble and its response created a contrary

---

themselves provided only for a one-year duration with right of cancellation on thirty days' notice).

[23] Freshii argues, unpersuasively, that a party can reasonably rely on statements that are contradicted by the terms of the contract. Freshii relies solely on *Persaud Cos. v. IBCS Group, Inc.*, No. 1:09vc94, 2010 WL 1404390, at *5-6 (E.D. Va. Apr. 5, 2010), which is distinguishable. In that case, the district court concluded that there was reasonable reliance because a bonding company actively misdirected a subcontractor away from contractual language providing that the subcontractor would not receive a refund if the general contractor rejected certain surety bonds. Here, there is no evidence that Old Fransmart actively misdirected Freshii away from the Agreement's language expressly providing that Old Fransmart would only provide franchise sales services.

impression. To support its claim that Old Fransmart was in financial straits at the time the Agreement was being negotiated in the summer of 2008, Freshii adduced evidence showing: (i) a judgment in the amount of $163,108.39 (plus $10,000 attorneys' fees) was entered against Old Fransmart on July 21, 2008; (ii) the landlord for Old Fransmart's main office in Alexandria, Virginia obtained a $96,345.91 judgment against Old Fransmart on June 6, 2009 for unpaid rent; (iii) Old Fransmart was sued for unpaid rent by the landlord for its California office; (iv) Old Fransmart was sued by Neale Architects, LLC, in Alexandria, which obtained a $20,036.00 judgment in November 2009.

Freshii's second theory of fraud in the inducement fails for a number of reasons. To begin with, the record evidence does not establish by clear and convincing evidence that Rowe falsely represented Old Fransmart's financial health because the record evidence does not show that Old Fransmart was in financial trouble during the pertinent time period. Rowe made his representations to Corrin during the negotiation process that occurred from April to August 2008. During that time, only one judgment existed against Old Fransmart, and there is no evidence in the record showing that Rowe was aware of any impending creditor actions. Moreover, the fact that Old Fransmart was subject to a few creditor actions does not establish by clear and convincing evidence that Old Fransmart was in any financial trouble at the time Rowe made his representations about Old Fransmart's financial health. Old Fransmart may have decided not to pay certain bills for business reasons unrelated to its financial well-being.

Freshii's second theory of fraud in the inducement also fails because the record evidence shows that Rowe's representations about Old Fransmart's financial viability constituted an opinion, which is not actionable as fraud. *See Mortarino v. Consultant Eng'g Servs., Inc.*, 467 S.E.2d 778, 781 (Va. 1996) ("It is well-settled that a misrepresentation, the falsity of which will


afford ground for an action in damages, must be of an existing fact, and not the mere expression of an opinion." (quoting *Saxby v. Southern Land Co.*, 63 S.E. 423, 424 (Va. 1909))). On this record, Corrin's questions were nothing more than a request for an opinion as to whether Fransmart was sufficiently viable to serve as Freshii exclusive marketing and sales agent for ten years. In response, Rowe gave Corrin his opinion—"that Fransmart would be a strong long-term business partner"—and he supported his opinion with true facts about the company's national presence, its offices on both coasts, and its staff. Clearly, an opinion supported by true statements does not serve as a basis for fraud.

Finally, there is no evidence in the record that Rowe fraudulently concealed the creditor actions. In Virginia, "[c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 597 (Va. 1984). Here, even assuming that Rowe was aware of the impending creditor actions, there is no evidence that Rowe knew that Freshii was entering into the Agreement based upon the assumption that Old Fransmart was not currently in litigation with any of its creditors and would not be subject to any future judgments. Freshii argues otherwise, noting that Corrin specifically asked Rowe about whether Old Fransmart was financially sound and sufficiently viable to serve as Freshii's exclusive marketing and sales agent for ten years. But no reasonable person in Rowe's position would know that by asking a question about Old Fransmart's *long-term* financial viability, Corrin was operating under the assumption that Old Fransmart would not be subject to any creditor actions. Thus, Rowe's nondisclosure of these actions does not constitute actionable concealment.

In sum, both of Freshii's theories of fraud in the inducement fail as a matter of law. Freshii's claim that Old Fransmart falsely represented that it would use a model for franchise

growth and expansion was not a false representation of present fact.  Even if it was, Freshii did

not reasonably rely on a model or methodology that was never discussed between the parties.  In

any event, the evidence in the record shows that Old Fransmart, now Fransmart, has used a

model or methodology for selling franchises, as it has continued to satisfy the sales quota set

forth in the Agreement.  Moreover, Freshii's claim that Old Fransmart falsely represented its

financial condition fails because the record evidence does not establish by clear and convincing

evidence that Old Fransmart was on the brink of financial trouble at the time the representations

were made, Rowe's representations were opinions about Old Fransmart's long-term financial

viability, and Rowe did not fraudulently conceal any creditor actions.  Accordingly, Fransmart is

entitled to summary judgment on Freshii's claim that it was fraudulently induced to enter into the

Agreement.

## C.  Lack of Specificity

Next, Freshii argues that the Agreement is invalid because it lacks specificity.  In

Virginia, "[t]he law does not favor declaring contracts void for indefiniteness and uncertainty,

and leans against a construction which has that tendency."  *High Knob, Inc. v. Allen*, 138 S.E.2d

49, 53 (Va. 1964).  For this reason, "[a] contract will be enforced if its obligations are *reasonably*

certain."  *R.K. Chevrolet, Inc. v. Hayden*, 480 S.E.2d 477, 481 (Va. 1997) (emphasis added).

According to the Restatement (Second) of Contracts, "[t]he terms of a contract are reasonably

certain if they provide a basis for determining the existence of a breach and for giving an

appropriate remedy."  Restatement (Second) of Contracts § 33 (1979).  Further, in Virginia, the

essential terms of a contract for services are "the nature and extent of service to be performed,

the place and the person to whom it is to be rendered, and the compensation to be paid."  *Reid v.*

*Boyle*, 527 S.E.2d 137, 145 (Va. 2000) (quoting *Mullins v. Mingo Lime & Lumber Co.*, 10 S.E.2d 492, 494 (Va. 1940)).

The nine-page Agreement between Fransmart and Freshii requires Fransmart to market and sell franchises using "commercially reasonable efforts to recruit potential franchisees on [Freshii's] behalf." The Agreement sets forth a specific number of franchises that Fransmart must sell each year. The Agreement has a fixed duration of ten years, and it makes Fransmart the exclusive sales agent of Freshii's franchises in every country in the world (except Canada). The Agreement also sets forth a detailed compensation structure. Freshii must pay Fransmart fifty percent of the initial franchise fees for each franchise it sells, and it must also pay Fransmart a certain percentage of royalties received from open units. Clearly, the Agreement contains all the essential terms required for a services contract under Virginia law, and the terms are sufficiently definite for a court to determine the existence of a breach and to give an appropriate remedy.

Freshii argues, unpersuasively, that the Agreement lacks the requisite specificity because it does not identify the "marketing" and "selling" activities that Fransmart is obligated to perform. It is well-settled that courts will enforce exclusive dealings contracts with broad performance obligations. *Cf. Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917) (upholding contract granting exclusive right to market products endorsed by fashion designer) (Cardozo, J.). With these contracts, it is often impractical to reduce performance obligations to well-defined terms because the parties do not foresee all of the possible contingencies that might arise during the course of contract performance. *See* Charles J. Goetz & Robert E. Scott, *Principles of Relational Contracts*, 67 Va. L. Rev. 1089, 1091 (1981).

Here, the Agreement is an exclusive marketing and sales contract that lasts for ten years. The parties sensibly did not identify all the tasks that Fransmart must perform in marketing and selling franchises because the methods that constitute effective marketing and selling at the time the Agreement was signed may not be effective in later years.  Moreover, the Agreement provides alternate mechanisms for Freshii to monitor and control Fransmart's performance:  (1) the Agreement requires Fransmart to use "reasonable efforts" to identify and recruit potential franchisees; (2) Freshii has the sole discretion whether to approve franchisees; and (3) Fransmart must sell a required number of franchises each year.  Under these circumstances, the failure to specify the marketing and selling activities that Fransmart must perform is not a fatal defect.[24] Accordingly, Fransmart is entitled to summary judgment on Freshii's claim of lack of specificity.

## D.  Lack of Mutuality

Freshii argues that the Agreement is invalid for lack of mutuality.  In Virginia, "[t]he general rule of law is . . . that where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has the right to hold the other to a positive agreement."  *Am. Agric. Chem. Co. v. Kennedy & Crawford*, 48 S.E. 868, 870 (Va. 1904).  Here, there is mutuality of contract because both parties have made enforceable promises.  On one hand, Fransmart has promised to sell a minimum number of franchises each year, using "commercially reasonable efforts to identify and recruit potential franchisees on [Freshii's] behalf."  Agreement ¶ 3(a).  On the other hand, Freshii has promised to compensate Fransmart for its marketing and sales efforts.

---

[24] The three cases cited by Freshii to support its lack-of-specificity argument are distinguishable because none of the cases deal with an exclusive dealings contract.  *See Albanese v. WCI Communities, Inc.*, 530 F. Supp. 2d 752, 763-64 (E.D. Va. 2007) (employment agreement); *Ericson v. Ericson*, 2007 Va. App. LEXIS 258, at *15-17 (Va. Ct. App. Jul. 3, 2007) (divorce agreement); *Lanier, Inc. v. Pagan*, CL98-007, 1998 WL 972153, at *2 (Va. Cir. Ct. Mar. 30, 1998) (construction agreement).

Freshii argues that the Agreement lacks mutuality because its sole remedy for

Fransmart's non-performance is termination of the Agreement. In other words, Freshii argues

that Fransmart has not bound itself to perform because it suffers no penalty by simply choosing

not to market and sell Freshii's franchises. This argument is unpersuasive because, although the

Agreement provides that Freshii *may* terminate the Agreement if Fransmart fails to meet its sales

quota or is otherwise in material breach, there is nothing in the Agreement stating that Freshii's

*sole* remedy is termination. *Cf. Busman v. Beeren & Barry Ins., LLC*, No. 2005-002650, 2005

WL 3476681, at *2 (Va. Cir. Ct. Dec . 12, 2005) (holding that sales agreement lacked mutuality

where agreement expressly provided that buyer's "sole remedy in law or equity" for seller's

default was a refund of its deposit). If Fransmart fails to perform its contractual obligations,

there is nothing in the Agreement that prohibits Freshii from suing for breach and damages.

## E. Unconscionability

Freshii's final challenge to the enforceability of the Agreement is that it is

unconscionable. In Virginia, a contract is unconscionable if it is "one that no man in his senses

and not under a delusion would make, on the one hand, and [that] no fair man would accept on

the other." *Mgmt. Enters., Inc. v. Thorncroft Co., Inc.*, 416 S.E.2d 229, 231 (Va. 1992) (internal

citations omitted). The substantive terms of the contract must be so grossly inequitable that it

"shocks the conscience." *Id.* The party asserting unconscionability of a contract has the burden

of proving that the contract is unconscionable by clear and convincing evidence. *Pelfrey v.

Pelfrey*, 487 S.E.2d 281, 284 (Va. Ct. App. 1997). Moreover, whether a contract is

unconscionable is a question of law for a court to decide. *See Art's Flower Shop v. C&P

Telephone Co.*, 413 S.E.2d 670 (W. Va. 1991); *see also Jones v. Dere*, No. LW-2612-4, 1995

WL 1055959, at *4 (Va. Cir. Ct. Aug. 16, 1995) (concluding that unconscionability is an issue of law).

Here, the record evidence does not establish that the Agreement is unconscionable. First, the undisputed factual record does not establish by clear and convincing evidence that there was unequal bargaining power between Old Fransmart and Freshii, or that Old Fransmart otherwise engaged in oppressive conduct during the negotiation process. *See Mobil Oil Corp v. Earhart Petroleum Inc.*, No. 99-2093, 2000 WL 530351, at *4 (4th Cir. May 3, 2000) ("Unconscionability deals primarily with a grossly unequal bargaining power at the time the contract is formed.") (quoting *Envirotech Corp. v. Halco Eng'g, Inc.*, 364 S.E.2d 215, 220 (Va. 1988)). In its briefs, Freshii attempts to portray Corrin as a young and inexperienced newcomer to the franchising business who was misled by Rowe into executing a grossly unfair contract. Yet, at the time Corrin negotiated the Agreement with Rowe, the record evidence shows that he was a sophisticated businessman who had already opened multiple restaurants in Canada; he had hired a large law firm to prepare a Franchise Disclosure Document and franchise agreement in preparation to begin franchising operations; and his company had other officers who were experienced in the restaurant business. Moreover, Corrin represented to Rowe that he had an attorney review the Agreement prior to signing it. The doctrine of unconscionability simply does not apply where, as here, sophisticated businessmen enter into a contract after negotiating at arms-length.

Second, the undisputed factual record does not establish by clear and convincing evidence that the substantive terms of the Agreement are so one-sided as to "shock the conscience." While the compensation structure may be generous to Fransmart, it does not come anywhere close to rising to the level of unconscionability. Similarly, the other terms highlighted

- 29 -

by Freshii (*e.g.*, lack of non-compete provision) may favor Fransmart, but they do not render the Agreement unconscionable. On this record, it appears that Freshii is simply unhappy with the terms of the deal that it struck, but "[c]ourts cannot relieve one of the consequences of a contract merely because it was unwise or rewrite a contract simply because the contract may appear to reach an unfair result." *Pelfrey*, 487 S.E.2d at 284. Therefore, Fransmart is entitled to summary judgment on Freshii's claim that the Agreement is unconscionable.

<div align="center">VI.</div>

Accordingly, summary judgment is granted in favor of Fransmart on the issue of whether Freshii is liable for breach of contract. Summary judgment is also granted in favor of Fransmart on all five of Freshii's affirmative defenses: (1) lack of standing; (2) fraudulent inducement; (3) lack of specificity; (4) lack of mutuality; and (5) unconscionability. Freshii's motion for summary judgment is denied in all respects.

An appropriate Order will issue.

Alexandria, Virginia
March 1, 2011

/s/
T. S. Ellis, III
United States District Judge